14 CV 0867

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



VALUE RECOVERY FUND LLC  and
AUGUSTUS INTERNATIONAL MASTER
FUND, L.P., on behalf of themselves and all
others similarly situated,

                                  Plaintiffs,

           vs.

BARCLAYS BANK PLC; CITIGROUP, INC.;
CITIBANK, N.A.; DEUTSCHE BANK AG;
HSBC HOLDINGS PLC; HSBC BANK PLC;
HSBC BANK USA, N.A.; J.P. MORGAN
CHASE & CO.; J.P. MORGAN CHASE BANK,
N.A.; ROYAL BANK OF SCOTLAND PLC;
UBS AG; and UBS SECURITIES LLC,

                                  Defendants.

Case No

**CLASS ACTION
COMPLAINT**


**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................................... 1

JURISDICTION AND VENUE ................................................................................................. 3

THE PARTIES ........................................................................................................................... 4

    A.     Plaintiffs.............................................................................................................. 4

    B.     Defendants ......................................................................................................... 5

BACKGROUND ON THE FOREIGN EXCHANGE MARKET ................................................. 8

    A.     Foreign Exchange Market Generally .................................................................. 8

    B.     Defendants' Market Dominance ....................................................................... 10

    C.     Opacity and Lack of Regulation in the Foreign Exchange Market ...................... 12

    D.     WM/Reuters Benchmark Rate as a Pricing Mechanism for Foreign
             Exchange Transactions ...................................................................................... 13

DEFENDANTS' WRONGDOING ............................................................................................ 17

    A.     Defendants Shared Their Customers' Confidential Orders with Their
             Competitors to Coordinate the Front Running of Those Transactions ................. 17

    B.     Defendants Acted Jointly and in Concert to Manipulate Benchmark Rates ......... 23

ONGOING GOVERNMENT INVESTIGATIONS ................................................................... 27

DEFENDANTS' ONGOING INTERNAL INVESTIGATIONS ................................................ 31

CLASS ACTION ALLEGATIONS ......................................................................................... 32

FRAUDULENT CONCEALMENT ......................................................................................... 34

CLAIM FOR RELIEF [VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §
1, *ET SEQ.*] .......................................................................................................................... 36

RELIEF SOUGHT ................................................................................................................... 37

DEMAND FOR JURY TRIAL ................................................................................................ 38

Plaintiffs Value Recovery Fund LLC and Augustus International Master Fund, L.P. (collectively, "Plaintiffs"), individually and on behalf of all persons and entities similarly situated, allege as follows:

## NATURE OF THE ACTION

1.      This action concerns Defendants' anticompetitive scheme to manipulate the benchmark foreign exchange rates ("WM/Reuters Rates," defined below) used to set the value of trillions of dollars of investments.

2.      The foreign exchange market is concentrated, opaque, and largely unregulated. Defendants are the largest foreign exchange dealers in the world, responsible for the vast majority of foreign exchange trading.  In the last two years, Defendants accounted for nearly 70 percent of all foreign exchange transactions.

3.      To minimize risks attendant to transaction execution, customers in the foreign exchange market often request that dealers execute their transactions on the basis of benchmark rates calculated by WM/Reuters based on the median exchange rate in the thirty seconds before and after each hour.  The most popular of these WM/Reuters benchmark rates is called the "London fix" or the "Closing Spot Rate" and is calculated at 4 p.m. in London.

4.      The WM/Reuters Closing Spot Rates are frequently used to provide standardized exchange rates for contract terms for 159 different currencies, the top 21 of which are commonly referred to as the "trade currencies."  These rates are the industry-wide, global standard for closing spot foreign exchange rates.

5.      In addition, WM/Reuters calculates intra-day spot rates, called WM/Reuters Intraday Spot Rates, which provide hourly rates for 159 currencies, with half-hourly assessments for the trade currencies.  Together, the WM/Reuters Closing Spot Rates and the

WM/Reuters Intraday Spot Rates are referred to herein as the "WM/Reuters Rates."

6.  Defendants engaged in a coordinated scheme to manipulate and make artificial WM/Reuters Rates, which adversely affected Plaintiff and Class members who traded foreign currencies referencing WM/Reuters Rates or who traded at or around the period in which the manipulative conduct took place (the "fix").

7.  Defendants used their knowledge of their clients' forthcoming transactions to reap enormous profits, at their clients' expense, using trading strategies that would have been highly risky, if not impossible, absent collusion with the other dealer-defendants.

8.  Specifically, because Defendants know their customers' orders tied to benchmarks in advance of the calculation of WM/Reuters Rates, Defendants have engaged in "front running." This is where a dealer trades its own positions in advance of its customers' orders, as to take advantage of the currency price movement that will occur as a result of the customers' transaction.

9.  Normally, such trading would be ill-advised because other market participants may execute trades during the fix that move the market in the opposite direction. But to ensure their front running bets paid off, Defendants agreed to share their customers' confidential information and to jointly strategize the execution of those orders.

10. Another collusive strategy Defendants profited off of is known as "banging the close." This involved, again, sharing confidential information about pending customer requests. Here, Defendants would further agree to break up, or consolidate, pending orders into a certain number of orders during the fixing period. Because WM/Reuters Rates are set at the median transaction, coordinated effort in this regard could move a benchmark rate itself in Defendants' preferred direction. The effects of this manipulation were magnified by a third strategy,

2

"painting the screen," which involved essentially fake transactions entered into during the fixing window.

11.     These collusive acts took place by way of, among other things, Bloomberg and chatrooms, brazenly labeled "The Mafia" and "The Cartel" by Defendants themselves. Such has been confirmed by the review of transcripts from these chatrooms, performed by governmental regulators and others investigating Defendants' illegal activity. These acts have also been confirmed by traders interviewed by media sources.

12.     Defendants' scheme to manipulate the WM/Reuters Rates has caused Class members to lose value on tens of thousands of foreign exchange transactions, resulting in potentially billions of dollars in damages.

13.     Not surprisingly, Defendants' anticompetitive conduct has attracted the attention of antitrust and other government enforcement agencies in the United States and around the world, which have open and active investigations into the same practices by many of the same Defendants named in this Complaint. As the pressure has mounted, many Defendants have confirmed that they are the subject of investigation and conducted their own internal investigations, in the process dismissing and suspending numerous senior foreign exchange traders.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28

3

U.S.C. § 1391(b), (c) and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.    This Court has personal jurisdiction over each Defendant, because each Defendant:  transacted business throughout the United States, including in this District; exchanged currency with Class members throughout the United States, including Class members residing or located in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.  In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

17.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## THE PARTIES

### A.    Plaintiffs

18.    Plaintiff Value Recovery Fund LLC ("VRF") is a Delaware limited liability Company, with a registered address of 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 and offices in Connecticut.  VRF has standing, by virtue of a valid assignment, to assert the federal antitrust claims herein as it was engaged in foreign exchange transactions during the Class Period and was injured as a result of Defendants' anticompetitive conduct.

19.    Plaintiff Augustus International Master Fund, L.P. ("Augustus") is a limited

4

liability company organized under the laws of the Bahamas with its principal place of business in Harrison, New York. During the Class Period, Augustus engaged in foreign exchange transactions and was injured as a result of Defendants' anticompetitive conduct.

**B.   Defendants**

20.    Whenever in this Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

21.    Defendant Barclays Bank Plc ("Barclays") is a British public limited company with its corporate headquarters in London, England. Barclays is licensed by the New York Department of Financial Services ("NYDFS") with a registered address at 745 Seventh Avenue, New York, NY, and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, NY. On October 30, 2013, Barclays stated that it has received inquiries from certain governmental authorities related to foreign exchange manipulation investigations and is "co-operating with the relevant authorities in their investigations." On November 1, 2013, the *Financial Times* reported that Barclays suspended six currency traders, including Chris Ashton, its global head of voice spot trading, Jack Murray, Mark Clark, Russell Katz and Jerry Urwin.

22.    Defendant Citigroup, Inc. is a Delaware corporation headquartered at 399 Park Avenue, New York, NY. Defendant Citibank, N.A. is a federally chartered national banking association headquartered at 399 Park Avenue, New York, NY, and is a wholly-owned subsidiary of Citigroup, Inc. Citigroup, Inc. and Citibank, N.A. are collectively referred to as "Citigroup." Citigroup Inc. confirmed on November 1, 2013 that "[g]overnment agencies in the

U.S. and other jurisdictions are conducting investigations or making inquiries regarding trading on the foreign-exchange markets," and that "Citigroup has received requests for information and is cooperating with the investigations and inquiries and responding to the requests." According to the *New York Times*, Citigroup suspended and then terminated its head of European spot trading, Rohan Ramchandani, and has placed two other traders on leave.

23.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German public company with its corporate headquarters in Frankfurt, Germany. Deutsche Bank is licensed by the NYDFS with a registered address at 60 Wall Street, New York, NY. Deutsche Bank has confirmed that it has received inquiries from regulators and is cooperating regarding probes into manipulation of the foreign exchange market, and had set aside a substantial sum for potential litigation. According to the New York Times, Deutsche Bank has placed several foreign exchange traders in its New York office on leave. One of those suspended traders is Robert Wallden, who was interviewed by the FBI in November 2013.

24.     Defendant HSBC Holdings Plc, is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank Plc is a wholly-owned subsidiary of HSBC Holdings Plc and is headquartered in London, England. Defendant HSBC Bank USA, N.A. is an indirect, wholly-owned subsidiary of Defendant HSBC Holdings Plc and has its principal executive offices in New York, NY. Defendants HSBC Holdings Plc, HSBC Bank Plc, and HSBC Bank USA, N.A. are collectively referred to as "HSBC." HSBC has confirmed that it is part of a global investigation regarding the manipulation of foreign exchange rates. According to the *Wall Street Journal*, HSBC has suspended Serge Sarramenga and Edward Pinto, two foreign exchange traders in London. Sarramenga was at one time head of the G10 spot foreign exchange desk.

6

25.    Defendant JPMorgan Chase & Co. is a financial services corporation headquartered at 270 Park Avenue, New York, NY.  Defendant JPMorgan Chase Bank, N.A. is a federally chartered national banking association and a wholly-owned subsidiary of JPMorgan Chase & Co., located at 270 Park Avenue, New York, NY.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to together as "JPMorgan."  JPMorgan Chase & Co. has confirmed in a regulatory filing that government authorities are investigating its currency trading business.  According to Bloomberg, JPMorgan has suspended Richard Usher, its chief foreign exchange dealer in London, and a former trader at UBS.

26.    Defendant Royal Bank of Scotland Group Plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  Defendant RBS is licensed by NYDFS with a registered address at 101 Park Avenue, New York, NY.  RBS has reportedly suspended two traders in connection with an investigation into foreign exchange rate manipulation.  On November 1, 2013, RBS stated that it "is reviewing communications and procedures relating to certain currency exchange benchmark rates as well as foreign exchange trading activity and is cooperating with these investigations."  According to *Bloomberg*, RBS has suspended Paul Nash and Julian Munson, two foreign exchange traders in London.

27.    Defendant UBS AG is a Swiss global financial services company headquartered in Basel and Zurich, Switzerland.  Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Boulevard, Stamford, CT, and is a wholly-owned subsidiary of UBS AG.  Defendants UBS AG and UBS Securities LLC are referred to together as "UBS."  UBS has acknowledged receiving requests from various authorities relating to its foreign exchange business.  UBS's quarterly earnings report, published on October 29, 2013, revealed that the bank had launched an internal probe of its foreign exchange business, following

7

reports of "widespread irregularities in the foreign exchange markets." According to the *Wall Street Journal*, UBS has restructured its foreign currency trading unit and its global head, Chris Vogelgesang, has stepped down.  UBS has dismissed at least two of its traders, Niall O'Riordan and Roger Boehler.  Matt Gardiner, a former UBS currency trader who is now at Standard Chartered, has also been suspended.

28.     Defendants were engaged in foreign exchange trades used in the calculation of the WM/Reuters Rates at all relevant times.

29.     Various other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

## BACKGROUND ON THE FOREIGN EXCHANGE MARKET

30.     Defendants are international companies that compete across a wide range of activities in the banking and financial services markets. Exchange rates are the prices at which worldwide currencies are traded.  Defendants ostensibly compete against each other to attract customers in the foreign exchange market, as well as amongst themselves with respect to proprietary trading of currencies.

### A.     Foreign Exchange Market Generally

31.     Foreign exchange, in simple terms, is the buying and selling of currency, or the exchanging of one type of currency for another.  The foreign exchange market is the largest in the financial system, with an estimated daily turnover between $4.7 trillion to $5.3 trillion. Roughly $1 trillion of that daily turnover occurs in the United States alone.

32.     The currency market often quotes a direct conversion rate by way of what are

called "currency pairs," which dictate the terms by which the first currency in a pair can be converted into the other currency in the pair. For example, the exchange rate between U.S. dollars (USD) and euros (EUR) can be expressed as follows:

$$EUR/USD = 1.3529$$

33.     The currency on the left of the slash is referred to as the "base currency," while the currency on the right is called the "quote" or "counter currency." The base currency (in the example above, the euro) is always equal to one unit (here, €1), and the quoted currency (in the example above, the U.S. dollar) is what that one unit is equivalent to in the other currency. This means that €1 will buy roughly $1.35.

34.     The majority of the daily turnover in the foreign exchange market — roughly $2 trillion — involves spot transactions. Roughly three quarters of all spot transactions involve the U.S. dollar. A spot foreign exchange transaction involves the exchange of currencies between two counterparties for immediate delivery. Large-scale spot transactions are usually handled by banks, including Defendants, which either act as counterparties to customer transactions or as brokers to match orders between customers.

35.     A considerable amount of currency spot trading is carried out by voice spot traders, who deal with clients over the phone. To initiate such a foreign exchange trade, a customer contacts a dealer indicating the currency and quantity she wishes to trade, and inquires as to the price. The dealer states prices at which he is willing to buy (the "bid") and sell (the "ask"). The customer then decides whether to buy, sell, or pass. The dealer is compensated for its services by a favorable gap between the quoted buy and sell prices, the "bid-ask spread."

36.     Post-financial crisis competition in foreign exchange markets has reduced

spreads offered to clients.  These spreads are the only legitimate (but, as described below, not the only) source of client-driven income for banks in foreign exchange trades.

37.     The foreign exchange market is also comprised of forward contracts, futures, options, swaps and other derivatives transactions.

38.     The foreign exchange market is largely organized as an over-the-counter (OTC) market.  In an OTC market, there is no centralized exchange and market participants have only partial knowledge about, among other things, other market participants' trades and available liquidity in different market segments.  Because there is no central trading location or exchange, most of the trading is conducted by telephone or through electronic trading networks.

39.     As market makers in the OTC market, banks, including Defendants, execute orders to buy and sell for clients as well as trade on their own accounts.  As a result, Defendants dominate the foreign exchange market.

**B.          Defendants' Market Dominance**

40.     In recent years, Defendants have maintained an aggregate market share of nearly 70 percent, according to a survey by *Euromoney*, an industry publication.  At all relevant times, Defendants were among the largest currency dealers in the United States.  Defendants' shares of the foreign exchange market in the previous two years are summarized below.

| 2012 and 2013 Rank | Bank | 2012 Market Share | 2013 Market Share |
|---|---|---|---|
| 1 | Deutsche Bank | 14.57% | 15.18% |
| 2 | Citigroup | 12.26% | 14.90% |
| 3 | Barclays | 10.95% | 10.24% |
| 4 | UBS | 10.48% | 10.11% |
| 5 | HSBC | 6.72% | 6.93% |
| 6 | JPMorgan | 6.60% | 6.07% |
| 7 | RBS | 5.86% | 5.62% |
| **Defendants' Aggregate Market Share:** | | **67.44%** | **69.05%** |

41.     Increasing competition for market share in the foreign exchange market amongst the Defendants and other banks since the financial crisis has cut into spreads — often down to a fraction of a basis point — offered to clients placing large orders.  For instance, Citigroup's fight for market share has included instructing traders to offer cheaper pricing on foreign exchange deals. As the *Financial Times* has noted, based on interviews with traders, given that spreads are "the only source of client-driven income for banks in forex trades, it may have encouraged traders to seek less transparent ways to cut their risks."[1]

42.     In addition, since the financial crisis, there have been staff reductions and "spot foreign exchange trading desks, even at the largest banks, are typically staffed with only eight to 10 traders, many of whom have worked previously with their counterparts in other banks."[2] As a result, despite the size of the foreign exchange market and Defendants' market share, the market is "dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."[3]  According to *Bloomberg*, many of the traders live near each other "and stay in touch over dinner, on weekend excursions or with regular rounds of golf at local clubs."[4]

43.     The *Financial Times* reports that interviews with more than a dozen foreign

---

[1]  Daniel Schafer, Alice Ross & Delphine Strauss, *Foreign Exchange: The Big Fix*, Financial Times (Nov. 12, 2013, 8:46 PM), http://www.ft.com/intl/cms/s/2/7a9b85b4-4af8-11e3-8c4c-00144feabdc0.html#axzz2mk6hcgF7.

[2]  *Id.*

[3]  Liam Vaughan, Gavin Finch & Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, Bloomberg (Dec. 19, 2013, 11:19 AM), http://www.bloomberg.com/news/2013-12-19/how-secret-currency-traders-club-devised-biggest-market-s-rates.html (quoting Professor Andre Spicer, a professor at the Cass Business School in London, who is researching the behavior of traders).

[4]  *Id.*

exchange veterans and investors suggest these changes in the structure of the Defendants' businesses and the small, close-knit exchange trader community have increased incentives and opportunism for collusion. As one former Citigroup banker noted, "This is a market in which price fixing and collusion could actually work."[5]

C.   **Opacity and Lack of Regulation in the Foreign Exchange Market**

44.   In addition to being heavily concentrated, the foreign exchange market is highly opaque. The foreign exchange market is not a market in the traditional sense in that there is no central trading location or "exchange." As a result, Defendants' foreign exchange desks "are like 'dark pools,' and they represent a major profit center for banks."[6]

45.   In particular, as market makers in an OTC market, Defendants have unique access to price information not otherwise available to the public. Dealers know the identities of their clients and by processing their orders they gain valuable information about the direction and volume of currency market trading.

46.   As stated in a March 2013 publication by BIS titled *Information Flows in Dark Markets: Dissecting Customer Currency Trades*, "All this suggests that dealers have a strong incentive to gain large market share (besides other reasons such as economies of scale in the provision of trading infrastructure, for example) and to set up trading in a way that reveals end-users' identities."[7]

---

[5]  Schafer et al., *supra* note 1.

[6] Ben Protess, Landon Thomas Jr. & Chad Bray, *U.S. Investigates Currency Trades by Major Banks*, New York Times DealB%k  (Nov. 14, 2013, 9:08 PM), http://dealbook.nytimes.com/20 13/11/14/u-s-investigates-currency-trades-by-major-banks/?_r=O.

[7] Lukas Menkhoff, Lucio Sarno, Maik Schmeling & Andreas Schrimpf, *Information Flows in Dark Markets: Dissecting Customer Currency Trades*, BIS Working Papers No. 405 (Mar. 2013),  http://www.bis.org/publ/work405.pdf.

47.     What Defendants can do with that information is relatively unregulated. Given the concentrated nature of the foreign exchange industry, coupled with the relative lack of oversight, the foreign exchange market is highly conducive to anticompetitive conduct.

48.     The United States does not have any specific rules or agencies governing spot or forward foreign-exchange trading. While firms are required by the Dodd-Frank Act to report trading in foreign-exchange swaps and forwards, spot dealing is exempt from the Act. U.K. regulators simply require dealers to act with integrity and avoid conflicts.

49.     Foreign exchange transactions also fall outside the European Union's Markets in Financial Instruments Directive, or MiFID, which requires dealers to take all reasonable steps to ensure the best possible results or executions for their customers.

50.     Additionally, there is no regulatory body overseeing or auditing the calculation of WM/Reuters Rates.

## D.     **WM/Reuters Benchmark Rate as a Pricing Mechanism for Foreign Exchange Transactions**

51.     Investors such as the Class utilize WM/Reuters Rates for benchmark purposes because doing so removes the possibility of poor transaction execution that can come with asset managers selecting the time for trading.

52.     WM Company, a unit of State Street Corporation, entered into a joint venture with Thomson Reuters to provide WM/Reuters Rates. The WM/Reuters Closing Spot Rates service was introduced in 1994. In 2001, the WM/Reuters Intraday Spot Rate service was launched to complement the Closing Spot Rates service by offering hourly currency exchange rates. In September 2012, the WM/Reuters Intraday Spot Rates services was further enhanced by the introduction of half-hourly fixes for the world's major currencies, also known as the trade

13

currencies. Today, the WM/Reuters Closing Spot Rates and WM/Reuters Intraday Spot Rates are published hourly for 159 currencies and half-hourly for 21 trade currencies. The normal calculation times of the WM/Reuters Rates are half-hourly from Monday 7:00 Sydney time to Friday 22:00 U.K. time. WM Company's target for completion of calculation and publication of the WM/Reuters Rates is 15 minutes after the fix time.

53.     WM/Reuters Closing Spot Rates and WM/Reuters Intraday Spot Rates serve as a settlement price for the trading of 159 currencies. As described in WM/Reuters" Spot & Forwards Rates Methodology Guide ("WM/Reuters' Rates Guide"), WM/Reuters rates "were rapidly adopted by index compilers, the *Financial Times*, and other users and became the de facto standard for closing spot rates on a global basis."

54.     WM/Reuters rates provide standardized benchmarks that allow fund managers to value holdings and assess performance measured against benchmarks without having any differences caused by exchange rates. Investors throughout the world use exchange rates as determined by the WM/Reuters fix to price, settle, and value trillions in foreign exchange-based financial instruments, including (i) spot foreign exchange transactions; (ii) outright forward transactions; (iii) foreign exchange swaps; and (iv) exchange-traded funds, closed-end funds and index funds.

55.     WM/Reuters rates have become a primary benchmark for foreign exchange transactions as a result of the belief by their users that they reflect competitive market forces and that WM Company's application of its calculation processes and quality control measures assure the integrity of the WM/Reuters Rates.

56.     According to the WM/Reuters' Rates Guide, "[m]any banks guarantee that they

14

will trade at WM/Reuters rates - this guarantee is useful for investors if they are making changes to a portfolio benchmarked against an index that uses WM/Reuters rates, as trading at these rates will avoid any reconciliation differences." Roughly 1% to 2% of global currency trading is conducted at the 4 p.m. fix.

57.     Trades made during a fix are used to determine the WM/Reuters benchmark rates. According to WM Company, WM/Reuters rates for non-trade currencies are calculated as follows:

> On the hour, the snapshot of the quoted rates, taken from Reuters over a two-minute fix period, are extracted. The median rates are then selected from these individual snapshots for each currency. This is done independently for bid and offer quotes.

58.     With respect to trade currencies, WM/Reuters rates are calculated using data from bids and offers and actual foreign exchange trades executed over a one-minute period, lasting 30 seconds before to 30 seconds after the time of the fix. Specifically, as described by WM Company, WM/Reuters rates for trade currencies are calculated as follows:

> Over a one-minute fix period, bid and offer order rates from the order matching systems and actual trades executed are captured every second from 30 seconds before to 30 seconds after the time of the fix. Trades are identified as a bid or offer and a spread is applied to calculate the opposite bid or offer.

> Using valid rates over the fix period, the median bid and offer are calculated independently, and then the mid rate is calculated from these median bid and offer rates, resulting in a mid trade rate and a mid order rate. A spread is then applied to calculate a new trade rate bid and offer and a new order rate bid and offer. Subject to a minimum number of valid trades being captured over the fix period, these new trade rates are used for the fix; if there are insufficient trade rates, the new order rates are used for the fix.

59.     The median methodology employed by WM/Reuters takes no account of the size of the notional behind each quote, weighting all quotes equally.

60.     The London 4 p.m. WM/Reuters Closing Spot Rates that are calculated on the last

trading day of the month are particularly relevant because many funds use the month-end

WM/Reuters Closing Spot Rates to value and rebalance their portfolios.  Because the 4 p.m.

benchmark determines how much profit dealers can make on the positions they have taken in the

preceding hour, there is a tremendous incentive to influence the rate.

61.    WM/Reuters Rates are also used in financial products such as forwards and other

foreign exchange contracts that require an exchange rate at settlement.

62.    Specifically, WM/Reuters Rates are used by the Chicago Mercantile Exchange

("CME") for pricing foreign exchange futures, forwards, and swaps contracts.  Pursuant to

Chapter 300 of the CME Rulebook, these contracts are settled in the following manner:

> Each CME WMR Contract, for a valid value date for cash settlement in one
> Business Day, shall be liquidated by cash settlement at a price equal to the daily
> Final Settlement Price for that day.  The daily Final Settlement Price shall be
> equal to the WM/Reuters Closing Spot Rate for that day for the specific currency
> pair in question, rounded to the nearest integral multiple of the minimum price
> increment as identified per the Appendix to this Chapter.

63.    WM/Reuters Rates are also used by International Securities Exchange to settle a

variety of foreign exchange options contracts for currency pairs referencing the U.S. dollar.  For

each of these options contracts, the settlement value is "[d]etermined on the last trading day

(usually a Friday) based on the WM/Reuters Spot Rate corresponding to 12:00 PM New York

time."

64.    The ubiquity of WM/Reuters Rates as pricing mechanisms in valuing and

assessing various financial instruments and holdings reinforces the importance of their accuracy.

As stated by Tom Kirchmaier, a fellow in the financial markets group at the London School of

Economics, in an interview with *Bloomberg*, "[t]he price mechanism is the anchor of our entire

economic system."  He further explained that any "rigging of the price mechanism leads to a

misallocation of capital and is extremely costly to society."

## DEFENDANTS' WRONGDOING

65.     Beginning in 2003 and continuing through the present, through concerted action and joint agreement, Defendants manipulated WM/Reuters Rates in order to profit off the execution of their customers' transactions.  Defendants sought to avoid the uncertainties and risks associated with foreign exchange trading – *i.e.*, that the market will move against a Defendant's position – by collectively agreeing to manipulate foreign exchange rates in a particular direction.  But for Defendants' concerted action and joint agreement, the otherwise risky manipulation strategy they undertook would not be possible.

66.     By sharing information about their customers' trades with their competitors, collectively agreeing to position themselves in the same way, coordinating their execution of customers' transactions, colluding with counterparts to boost chances of moving the rates, undertaking fictitious transactions with one another, and generally agreeing to manipulate the WM/Reuters Rates, Defendants reaped billions of dollars in profits directly from their clients who traded foreign currencies referencing WM/Reuters Rates or who traded at or around the period in which the manipulative conduct took place.

### A.     Defendants Shared their Customers' Confidential Orders with Their Competitors to Coordinate the Front Running of Those Transactions

67.     Front running is the disfavored (and in some jurisdictions unethical or illegal) practice whereby a dealer bank trades its own position in advance of its customer's order – in effect, trading on the inside information that its client will soon after execute an order that the dealer could profit on through effective pre-positioning.  A dealer bank with knowledge of a significant customer order that it believes will move a particular currency market may adjust its own positions in order to profit or avoid losses at its customer's expense.

68.     Because of the size and trading volume of the foreign exchange market,

17

particularly around the 4 p.m. fix, front running based only on a single Defendant's customer's trading information is a highly risky strategy that could easily backfire, because of the possibility that the market could move in a direction opposite of that taken by a dealer. It is thus only attempted where there is a high degree of knowledge about the other banks' positions. As a trader noted, front running "could still backfire if another dealer with a larger position bets in the other direction or if market-moving news breaks during the 60-second window."[8] Thus, according to a former dealer interviewed by *Bloomberg*, front running is "a risky strategy that he only attempted when he had a high degree of knowledge of other banks' positions and a particularly large client order."[9]

69.     To ensure that their illegal front running attempts were successful, Defendants agreed to exchange information about their large customer orders so that they could coordinate their pre-positioning activity. A former Citigroup employee told the *Financial Times* that "sharing information was a 'natural' development" of the market because while 'it's collusion . . . in a lot of ways it's also risk-management."[10]

70.     Defendants' traders agreed that they would accumulate all of each of their Institutions' "buy" orders in a specific currency so that they were responsible for all of the planned trades, and then would share their overall positions with their competitors at other

---

[8]     *See* Liam Vaughan, Gavin Finch & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, Bloomberg (Jun. 26, 2013, 2:06 PM), http://www.bloomberg.com/news/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.html.

[9]     *Id.*

[10]    Schafer et al., *supra* note 1.

Defendant banks.[11]  The traders would rely on voice brokers and salespeople within the
Defendant banks to aggregate client orders and indicate to the traders what the overall likely
positions were.[12]  Traders would then, in turn, share this information with traders at competing
banks.

71.     The sharing of information with competitors was typically done through
private Bloomberg chatrooms or instant messaging services.  While, as the *Financial Times*
reported, "the chatroom cacophony in the clubby world of foreign exchange traders was
peppered with allusions to drinks, drugs and women,"[13] the traders also used these platforms to
exchange information about client orders and price movement.

72.     Traders interviewed by *Bloomberg* have indicated that Defendants' traders
"would share details of orders with brokers and counterparts at banks through instant messages
to align their strategies" and they "also would seek to glean information about impending trades
to improve their chances of getting the desired move in the benchmark."[14]  Traders employed
by the Defendants interviewed by the *Wall Street Journal* and *Financial Times* also confirmed
that traders would communicate through "an electronic chat room populated  by top traders at
financial institutions"[15] and "chatroom discussions between rival traders . . . allowed them to

---

[11]  Katie Martin & David Enrich, *Forex Probe Uncovers Collusion Attempts*, Wall St. J.
(Dec. 19, 2013, 8:52 AM),
http://online.wsj.com/news/articles/SB10001424052702304866904579267901064067572.

[12]  Chiara Albanese, Katie Martin & David Enrich, *Barclays, Other Banks Expand
Foreign-Exchange Review to Salespeople*, Wall St. J. (Nov. 19, 2013, 2:31 PM),
http://online.wsj.com/news/articles/SB40001424052702303755504579207963677009926.

[13]  Schafer et al., *supra* note 1.

[14]  Vaughan et al., *supra* note 8.

[15]  Katie Martin, *Forex Probe Eyes Chat Room*, Wall St. J. (Oct. 11, 2013, 3:54 PM),
http://online.wsj.com/news/articles/SB10001424052702303382004579129640105188078.

share information about pricing and order books."[16]

73.     For example, one specific chatroom, whose group was known alternatively as the "Mafia" or the "Cartel," was used by senior foreign exchange traders employed by the Defendants, including:  Richard Usher, a former trader of Defendant RBS who is currently head of spot trading for Defendant JPMorgan, and who acted as the moderator of the chatroom; Rohan Ramchandani, Defendant Citigroup's head of spot trading; Matt Gardiner, who was previously employed by Defendants UBS and Barclays; Chris Ashton, head of voice trading at Defendant Barclays; and Niall O'Riordan, a senior trader at Defendant UBS.[17]  These senior traders at Defendants' banks regularly exchanged confidential information with one another and conspired to use it jointly to preposition the Defendants and to coordinate their execution of customers' trades to take advantage of client orders.

74.     Other chatrooms existed as well under various monikers including "The Club," "The Bandits' Club," "The Dream Team," "One Team, One Dream" and "The Sterling Lads."[18] The various chatrooms focused on different currencies.[19]  Traders were often members of several chatrooms.[20]  The transcripts of some of these chatrooms contain instances in which traders "joked about their abilities to influence exchange rates."[21]  For example, in one chat,

---

[16] Schafer et al., *supra* note 1.

[17] *Id.*

[18] Martin, *supra* note 15; Schafer et al., *supra* note 1; Liam Vaughan, Gavin Finch & Bob Ivry, *Forex Market Investigation: Collusion in the Chat Rooms?* Bloomberg (Jan. 2, 2014), http://www.businessweek.com/articles/2014-01-02/foreign-exchange-traders-may-have-used-chat-rooms-to-rig-market.

[19] John Letzing, Chiara Albanese & Katie Martin, *Currency-Trading Probe Gains Momentum*, Wall St. J. (Oct. 29, 2013, 10:51 AM), http://online.wsj.com/news/articles/SB20001424052702304200804579164841995315318.

[20] Schafer et al., *supra* note 1.

Robert Wallden, a director within Defendant Deutsche Bank's foreign exchange trading unit in New York, boasted about his ability to influence currency markets.[22]

75.    According to traders interviewed by *Bloomberg*, entry into the chat room called "The Cartel" was coveted by non-members because they saw it as a "golden ticket" in light of the influence it exerted on the WM/Reuters Rates.

76.    Defendants' traders agreed to use these chatrooms to, among other things, get a view about overall order flows across the foreign exchange market and to use this information to build up positions just ahead of and during the fix.  Based on preliminary evidence uncovered in the course of government investigations, "[s]hortly before the fix . . . it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place."[23]

77.    Defendants' traders even colluded with other non-party day traders who then made bets on their behalf, in order to sidestep the restrictions on personal trading.  Defendants' employees used mobile phones and instant messaging to transmit details of impending orders to these day traders, who worked from rented trading desks in offices in Kent and Essex, just outside of London.  The dealers often had close personal relationships with day traders, many of whom were former traders with experience in the industry.  Profits from the trades would then be split between the day traders and Defendants' employees.[24]

---

[21] Albanese et al., *supra* note 12.

[22] David Enrich, Katie Martin & Jenny Strasburg, *FBI Tries New Tactic in Currency Probe*, Wall St. J. (Nov. 20, 2013, 5:46 PM), http://online.wsj.com/news/articles/SB10001424052702304607104579210041033806468.

[23] Martin & Enrich, *supra* note 11.

[24] Ambereen Choudhury, Liam Vaughan & Gavin Finch, *FX Dealers Said to Use Day Traders to Make Personal Bets*, Bloomberg (Nov. 20, 2013),

78.     Defendants shared confidential customer information with other dealer banks, and profited off of such conduct, even though it was prohibited by the ACI – The Financial Markets Association ("ACI"), a trade association of foreign exchange and money-market traders. In February 2013, ACI updated its rulebook titled, *The Model Code: The International Code of Conduct and Practice for the Financial Markets*. The ACI Model Code states that a firm's "[w]ritten procedures should clearly stipulate the institution's control policy in relation to 'front running' or 'parallel running'; where traders knowingly execute trades in front of a customer order. These trades would not have been executed without that prior information obtained; hence this is a form of insider trading and should be banned accordingly."

79.     In addition, the ACI Model Code states: "Dealers and sales staff should not, with intent or through negligence, profit or seek to profit from confidential information, nor assist anyone with such information to make a profit for their firm or clients. Hence employees have a duty to familiarize themselves with the requirements of the relevant legislation and regulations governing insider dealing and market abuse in their jurisdiction."

80.     The ACI Model Code also states that not only should dealers refrain from trading against confidential information, "they should never reveal such information outside their firms, even after they have changed employment."

81.     In the event of a breach of these rules concerning front running, the ACI Model Code provides: "management should act promptly to investigate the breach and should take appropriate steps to rectify the weaknesses that allowed the breach to occur. Appropriate sanctions should be available to, and used by, management against staff who do not comply with policy."

---

http://www.bloomberg.com/news/2013-11-19/fx-dealers-said-to-use-day-traders-to-make-personal-bets.html.

82.     Shortly after *Bloomberg* reported on price manipulation in the foreign exchange market, ACI issued a press release on June 12, 2013 reminding its members of these guidelines forbidding front-running.

83.     Similar guidelines were established by the Bank of England in November 2011. The Bank of England's Non-Investment Products Code states that "caution should be taken so that customers' interests are not exploited when financial intermediaries trade for their own accounts."  It also states that "manipulative practices by banks with each other or with clients constitute unacceptable trading behavior."  Sixteen of the largest banks, including Defendants Barclays, JPMorgan, and Deutsche Bank, have signed this code of conduct.

**B.     Defendants Acted Jointly and in Concert to Manipulate Benchmark Rates**

84.     Once Defendants had shared the confidential information of their customers and had an understanding of the overall order flows across the market, they agreed to act in concert to manipulate the WM/Reuters Rates so as to profit off their customers' transactions.[25]

85.     Traders at each of the Defendants' banks used the aforementioned chatrooms, according to individuals with knowledge of the evidence uncovered in government investigations, "to lay out their strategies" and "agreeing to flood the market with orders for currencies at an opportune time each day."[26]  Specifically, Defendants agreed to execute a number of manipulative trading strategies in order to rig the WM/Reuters Rates.

86.     Defendants' traders jointly undertook a "banging the close" strategy to manipulate WM/Reuters Rates, according to four dealers interviewed by *Bloomberg*.[27]

---

[25]  This has been confirmed by at least five dealers interviewed by *Bloomberg*.  Vaughan et al., *supra* note 8.

[26]  Protess et al., *supra* note 6.

[27]  Vaughan et al., *supra* note 8.

"Banging the close" — a term used by the traders in chatrooms — involves making a high number of trades in the short window that is used to calculate the WM/Reuters Rates.

87.     According to three dealers interviewed by Bloomberg, "[t]o maximize profits, dealers would buy or sell client orders in installments during the 60-second window to exert the most pressure possible on the published rates."[28]  Another dealer added that "[b]ecause the benchmark is based on the median of transactions during the period, placing a number of smaller trades could have a greater impact than one big deal."[29]  Thus, by subdividing large customer orders into small trades, a dealer can artificially increase or decrease an exchange rate for a given currency pair.

88.      Using the aforementioned chatrooms, Defendants' traders would agree on the timing of order execution to ensure that this "banging of the close" moved the WM/Reuters Rates as much as possible.

89.     Defendants' traders would regularly agree to manipulate WM/Reuters Rates through concentrating orders in the moments before and during the 120-second (for non-trade currencies) or 60-second (for trade currencies) fixing window for WM/Reuters Rates.  In order to ensure that this manipulation had a substantial impact on currency price, Defendants coordinated to make sure they were not executing off-setting transactions during that short fixing period.  Evidence uncovered in the course of government investigations has confirmed that "traders from different banks . . . agreed to a sequence for placing their own trades to their advantage."[30]

---

[28] *Id.*

[29] *Id.*

[30] Martin & Enrich, *supra* note 11.

90.     Thus, for example, if Defendants intended to manipulate the EUR/USD exchange rate by selling euros in order to suppress the price, they would collectively agree not to buy euros during that period so as to ensure the manipulation would be most effective.  By reaching agreement on the trading strategy, they also minimized the likelihood of any Defendant engaging in offsetting foreign exchange transactions at the fixing window that could cause the banks to lose money.

91.     Given the large size of these foreign exchange trades, even a small movement in the exchange rates can be worth hundreds of thousands of dollars, if not more.  For example, a move in the benchmark of 2 basis points (0.02%) in the exchange rate between euros to Swiss francs for a transaction with a notional amount of one billion francs would be worth 200,000 francs ($216,000).

92.     Banging the close can also work in tandem with front running.  An example of how these practices can work in conjunction can be illustrated as follows:  An investor seeks to sell 2 billion euros (EUR) for U.S. dollars (USD).  The investor contacts a foreign exchange dealer (such as one of the Defendants) at 3:00 pm GMT to have this trade executed at the 4 p.m. WM/Reuters fix rate for EUR/USD.

93.     Seeing the size of the transaction, the dealer, in coordination with other dealers to minimize the risk of offsetting transactions, sells its own euro holdings at the highest possible price before attempting to lower the rate and repurchase euros at a much lower price. The scheme does not end there because the dealer needs to artificially move the WM/Reuters Rate at which its customer's orders will be executed.  By coordinating with other dealers to bang the close during the one-minute window surrounding the WM/Reuters 4 p.m. fix, the dealer can drive down the EUR/USD rate, thereby allowing it to purchase euros at an artificially low price.  As a result, the customer is receiving an artificially reduced rate, thereby

25

reducing the value received by the customer for the trade.

94.     Through collusive trading in the interdealer market, Defendants were also able to position themselves to buy their own customers' holdings at the lowest price possible. Defendants would regularly agree to sell their own holdings in the interdealer market at a high price just before banging the close and then repurchase those holdings at a much lower price while manipulation is occurring and customers' sell orders are being executed.

95.     Defendants also conspired to further exaggerate the effects of this manipulation by "painting the screen" — a practice of placing orders with other dealers to create the illusion of trading activity in a given direction in order to move the rates prior to fixing. Defendants agreed to execute numerous transactions around the time of the fixing, only to reverse or unwind these positions after the fixing.

96.     The losses incurred by Class members as a result of Defendants' manipulative and collusive practices have led some fund managers like James Cochrane, the director of analytics at Investment Technology Group, Inc., to conclude that "[f]unds that consistently trade using the WM/Reuters fix are basically trading against themselves, and their portfolio is taking a hit."

97.     Defendants' manipulation of WM/Reuters Rates also adversely impacted financial instruments that reference WM/Reuters Rates, including forwards, options and other contracts.

98.     Thus, by agreeing through chatrooms and instant messages to coordinate the execution of customer orders, "bang the close," "paint the screen" and execute advance deals within the interdealer market, Defendants artificially inflated and suppressed currencies so as to affect the WM/Reuters Rates and profit off their customers' transactions. Defendants engaged in these agreements throughout the Class Period with the purpose and effect of manipulating

26

the WM/Reuters Rates to the detriment of Plaintiffs and the Class.

## ONGOING GOVERNMENT INVESTIGATIONS

99.     On June 12, 2013, the United Kingdom Financial Conduct Authority ("FCA")
launched a preliminary inquiry into alleged manipulation of currency rate benchmarks. That
probe was officially confirmed on October 16, 2013. According to the *Financial Times*, the
FCA' s investigation was spurred after a former trader at one of the leading banks "gave the
[FCA] information about chat room discussions between rival traders that allegedly allowed
them to share information about pricing and order books."[31] Another complainant to the FCA
was one of Europe's largest money managers, who invests on behalf of pension holders and
savers.

100.     Following the FCA's announcement of a preliminary investigation, the FCA sent
requests for information to a number of Defendants named here.[32] Among those Defendants is
Defendant RBS, which has tendered transcripts of instant messages to the FCA after
concluding that a former trader's communications with counterparts at other firms may have
been inappropriate. That trader has since been identified as Richard Usher, a former trader at
Defendant RBS and current head of spot trading at Defendant JPMorgan. Currently, the FCA
is examining the communications of at least 40 traders in connection with their probe. British
regulators expanded their probe into the manipulation of global currency markets by asking
banks to examine foreign-exchange traders' personal transactions.[33]

---

[31]   Schafer et al., *supra* note 1.

[32]   Gavin Finch & Liam Vaughan, *RBS Said to Give Currency Trader's Chats to FCA Amid Probe*, Bloomberg (Oct. 10, 2013, 1:55 PM), http://www.bloomberg.com/news/2013-10-08/rbs-said-to-pass-currency-trader-chats-to-fca-amid-probe.html.

[33]   Suzi Ring, *U.K. Said to Probe Private Accounts of Currency Traders*, Bloomberg (Nov. 19, 2013, 3:13 AM), http://www.bloomberg.com/news/2013-11-18/u-k-said-to-probe-

101.    In the United States, in October 2013, the U.S. Department of Justice, in conjunction with the FBI, opened a criminal investigation into possible manipulation of foreign exchange rates.[34] Mythili Raman, head of the DOJ's criminal division, stated that the criminal and antitrust divisions of the DOJ "have an active and ongoing investigation into the possible manipulation of foreign-exchange rates.  We are responding aggressively and taking it very seriously.  We are looking at global conduct, and you can expect a global response."  The DOJ has issued subpoenas in connection with its investigation, and authorities have secured the cooperation of at least one trader.

102.    As part of the investigation, FBI agents made an unannounced visit at the home of Robert Wallden, a director within Deutsche Bank's foreign currency trading unit, and showed him transcripts of electronic chats in which he appeared to be boasting about manipulating the foreign exchange markets.

103.    Indicating the severity of Defendants' conduct, U.S. Attorney General Eric H. Holder Jr. has already spoken publicly about this investigation, telling the New York Times that "The manipulation we've seen so far may just be the tip of the iceberg" and "We've recognized that this is potentially an extremely consequential investigation."[35]

104.    The U.S. Commodity Futures Trading Commission has opened a parallel investigation.[36] Defendants have been asked to search records including traders' emails and chat sessions, and have been provided with specific dates, phrases, and keywords.

---

private-accounts-of-currency-traders.html.

[34] Tom Schoenberg, *U.S. Said to Open Criminal Probe of FX Market Rigging*, Bloomberg (Oct. 12, 2013, 12:01 AM), http://www.bloomberg.com/news/2013-10-11/u-s-said-to-open-criminal-probe-of- fx-market-rigging.html.

[35] Protess et al., *supra* note 6.

[36] Finch & Vaughan, *supra* note 32.

105.    In addition, the U.S. Federal Reserve (the "Fed") and the Office of the Comptroller of the Currency ("OCC"), an independent bureau of the U.S. Treasury, are investigating whether traders at the largest foreign exchange dealers rigged foreign exchange benchmarks. The Fed has the authority to fine foreign exchange dealer banks for failing to properly supervise their foreign exchange traders. In early January 2013, the Fed and OCC sent investigators to Citigroup's London headquarters in Canary Wharf as part of their internal investigation into manipulation of the foreign exchange market.

106.    The Federal Reserve Bank of New York ("FRBNY") has a Foreign Exchange Committee. Its members include FRBNY, several dealer banks, including Defendants Deutsche Bank, Barclays, Citigroup, UBS, JPMorgan, and other entities. On November 13, 2013, JPMorgan hosted a meeting of the Foreign Exchange Committee. According to the minutes of the meeting, recent developments regarding foreign exchange reference rates were discussed. Michael Nelson, counsel for FRBNY, attended the meeting and, according to the minutes, "noted that the Committee would not discuss the firms and names mentioned in press articles and that representatives of Federal Reserve Bank of New York (FRBNY) present would and could not address any investigations and/or supervisory actions."

107.    The minutes also stated that "[p]rivate sector members suggested that any investigations and/or supervisory activity related to this subject could eventually result in recommended changes to best practices guidelines."

108.    On October 4, 2013, the Swiss Financial Market Supervisory Authority ("FINMA") opened an investigation into manipulation of foreign exchange benchmarks. In a statement to the press, FINMA stated it "is coordinating closely with authorities in other

countries as multiple banks around the world are potentially implicated."[37]

109.     On September 30, 2013, the Swiss competition authority WEKO also reportedly opened an investigation after receiving allegations of collusion among banks to manipulate some foreign exchange rates.  Defendant UBS is being probed by the Swiss regulators, among others.

110.     On October 7, 2013, the European Commission's antitrust regulators, most notably Joaquin Almunia, also announced their intentions to open an investigation into alleged manipulation of foreign exchange benchmarks.  A person with knowledge of the European Commission's preliminary investigation stated that dealer banks are racing to the EC to volunteer information on currency markets "to betray their competitors to avoid possible European Union fines for rigging foreign-exchange markets."

111.     In Asia, the Hong Kong Monetary Authority ("HKMA") initiated an investigation into suspected price manipulation in the foreign exchange market, joining the United States and EC investigations.  In a statement to Reuters on October 16, 2013, HKMA stated that it "is aware of the allegations.  We have been in communications with the relevant overseas regulators and following up with individual banks."[38]

112.     In Singapore, the Monetary Authority of Singapore ("MAS") has opened an investigation into manipulation of the foreign exchange markets.  MAS stated that it "has been in touch with foreign regulators on the issue of alleged manipulation of WM/Reuters foreign

---

[37] Kathryn Brenzel, *Swiss Regulator Launches Probe Over FX Market Rigging*, Law360 (Oct. 4, 2013, 11:55 AM), http://www.law360.com/art1cles/478126/swiss-regulator-launches-probe-over-fx-market-rigging.

[38] Josh Noble, *Hong Kong Regulator Joins Global Forex Probe*, Financial Times (Oct. 16, 2013, 1:02 PM), http://www.ft.com/intl/cms/s/0/80c7ea68-364e-lle3-8ae3-00144feab7de.html.

exchange benchmark rates. We stand ready to assist in their investigations."[39]

113.    The Dutch regulator AFM has started a study into possible manipulation of the foreign exchange benchmark.[40]

114.    These global probes into the foreign exchange market have widened to encompass at least 15 banks, including all of the Defendants. Regulatory bodies across the globe are focusing on a variety of currency pairs, including the euro-dollar market, which is the most liquid currency market in the world and comprises nearly a quarter of all foreign exchange transactions. Other currencies under scrutiny include the pound sterling, the Australian dollar, and Scandinavian currencies.

## DEFENDANTS' ONGOING INTERNAL INVESTIGATIONS

115.    As Defendants' practices in the foreign exchange market have come under increased scrutiny from both the press and government regulators, Defendants have suspended, terminated, or placed on leaves of absence numerous senior foreign exchange traders connected to the misconduct.

116.    At least 15 currency traders have been disciplined by various Defendants as a result of Defendants' own internal probes, including: Niall O'Riordan, former spot FX trader at UBS; Roger Boehler, former spot FX trader at UBS; Julian Munson and Paul Nash, London currency traders at UBS; Robert Wallden at Deutsche Bank; Matt Gardiner of Standard Chartered, and former senior FX trader at Barclays and UBS; Richard Usher, head of spot FX

---

[39] Rachel Armstrong & Kevin Lim, *Singapore Ready to Assist in Global Currency Rigging Probe*, Reuters (Oct. 24, 2013, 8:50 AM), http://www.reuters.com/article/2013/10/24/markets-fx-rigging-singapore-idUSL3NOIE2X020 131024.

[40] Corina Ruhe & Maud van Gaal, *Dutch Regulators Study Risk of Benchmark Manipulation*, Bloomberg (Dec. 12, 2013, 4:05 AM), http://www.bloomberg.com/news/2013-12-12/dutch-regulators-study-risks-of-benchmark-manipulation.html.

trading at JPMorgan and former trader at RBS; Rohan Ramchandani, head of Citigroup's European spot trading; Serge Sarramenga and Edward Pinto, two foreign exchange traders in London at HSBC; Chris Ashton, the global head of spot trading at Barclays; and Jack Murray, Mark Clark, Russell Katz and Jerry Urwin, spot FX traders at Barclays.

117.    The suspended or terminated traders include at least three recent members of an influential industry committee convened under the auspices of the Bank of England to oversee London's foreign exchange markets.  Ramchandani, Usher and O'Riordan are three of the eleven high-ranking spot traders who sit on the London Foreign Exchange Joint Standing Committee's chief dealers' subgroup, which is chaired by a staff member of the Bank of England.  The group, formed in 2005, met three times in 2012 to discuss matters such as regulatory developments and market conditions, including intelligence on the currency markets.

118.    In the Committee's April 23, 2012 meeting, held at BNP Paribas SA's London office, the members discussed the rules they were subject to when trading close to the times when the WM/Reuters Rates are set.  Both Ramchandani and O'Riordan were present at this meeting.

## CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities that traded foreign currency at or around the fixing of the WM/Reuters Rates, beginning as early as January 1, 2003 and continuing to the present. Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States government.

120.    Plaintiffs believe that there are at least hundreds, if not thousands, of members

of the Class as described above, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

121.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilized and/or otherwise manipulate the WM/Reuters Rates for various currency pairs in the United States in violation of the Sherman Act;

b.    The identity of the participants in the conspiracy;

c.    The duration of the conspiracy;

d.    The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the class;

f.    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Class;

g.    The appropriate injunctive and equitable relief for the Class; and

h.    The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

33

122.    Plaintiffs engaged in foreign exchange transactions at rates that were manipulated by Defendants, and their interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiffs are members of the Class; have claims that are typical of the claims of the Class members; and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

123.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

124.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

125.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that number of individual actions would engender. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as the ones asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

126.    Throughout the Class Period, Defendants and their co-conspirators

affirmatively and fraudulently concealed their unlawful conduct.

127.    Neither Defendants nor their co-conspirators told Plaintiffs or other members of the Class that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the WM/Reuters Rates underpinning foreign exchange transactions.  Furthermore, price-fixing conspiracies are inherently self-concealing.

128.    Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

129.    Defendants and their co-conspirators were able to affirmatively conceal their conspiracy by, among other things, engaging in secret communications, including participation in online chat rooms to discuss customer orders and to coordinate trading strategies.

130.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs and the Class's claims have been tolled.

131.    Plaintiffs and the members of the Class did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until, at the earliest, June 12, 2013, when Bloomberg reported that it interviewed several former foreign exchange traders who claimed that the WM/Reuters Rates were being manipulated by the major foreign exchange market participants, including Defendants.  Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

132.    Further, reasonable due diligence could not have uncovered Defendants

conspiracy because (1) Defendants' trades and trading strategies are not public information;

and (2) the bilateral, non-exchange traded nature of the trades at issue further obscures what

Defendants were, and are, doing at any particular time.

133.    As a result of the self-concealing nature of the price-fixing conspiracy, the

active steps taken by Defendants to fraudulently conceal their conspiracy and the lack of public

information concerning material aspects of the conspiracy, the statute of limitations was tolled

for Plaintiffs claim.


## CLAIM FOR RELIEF

### [Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*]

134.    Plaintiffs re-allege each allegation in the preceding paragraphs of this

Complaint.

135.    Defendants and their unnamed co-conspirators entered into and engaged in a

combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

136.    During the Class Period, Defendants entered into a series of agreements to

reduce competition amongst themselves by coordinating trading strategies for the purpose of

manipulating the WM/Reuters Rates for various currency pairs.

137.    This conspiracy to manipulate the WM/Reuters Rates caused injury to both

Plaintiffs and the Class because they were deprived of the benefit of accurate WM/Reuters

Rates reflecting actual market conditions, as well as accurate spot foreign exchange rates at or

around Defendants' unlawful conduct, and thus received, upon execution of their trades, less in

36

value than they would have received absent Defendants' wrongful conduct.

138.    The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the foreign exchange market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conduct.

139.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property throughout the Class Period.

140.    Plaintiffs and members of the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiffs and members of the Class are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above.

## **RELIEF SOUGHT**

Accordingly, Plaintiffs demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a),(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as a class representative, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.    That the Court award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in

accordance with such laws, plus interest;

E.  That the Court award Plaintiffs and the Class their costs of suit, including

reasonable attorneys' fees and expenses, as provided by law; and

F.  That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

Dated:  February 10, 2014

ENTWISTLE & CAPPUCCI LLP

Andrew J. Entwistle
Vincent R. Cappucci
Robert N. Cappucci
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: (212) 894-7200

*Counsel for Value Recovery Fund LLC, Augustus
International Master Fund, L.P. and the Proposed
Class*